IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HIGHLAND DEVELOPMENT, INC., et al.,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>DUCHESNE COUNTY, et al.,<br><br>Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br><br>Case No. 2:03-CV-750 TC |

Highland Development, Inc., Duchesne Land LC, and Frank and Joan Steed (Plaintiffs) are building a large phased residential development (known as the "Utah Mini Ranches") in Duchesne County, Utah.  The County, its building inspector Karl Mott, and other County officials (all of whom are Defendants) oversee the construction, which is subject to County building codes.  The Plaintiffs must receive building permits and other approvals from the County before they can construct and sell each home.

The Plaintiffs contend that the Defendants have maliciously delayed construction of the Utah Mini Ranches by imposing irrational and burdensome design, building, and documentation requirements throughout the permit process.  The Defendants, who deny the Plaintiffs' claims that the Defendants have violated the Plaintiffs' constitutional rights of equal protection and due process, have filed a Motion for Summary Judgment on the Federal Claims.

The Plaintiffs have not presented evidence of similarly-situated comparators (a requirement for their equal protection claim).  Nor have they presented evidence of the

Defendants' behavior that would shock the court's conscience (a requirement for their substantive due process claim).  And they have not presented evidence sufficient to demonstrate a biased tribunal.  For these reasons, and others detailed below, the Defendants' Motion for Summary Judgment is GRANTED.

Further, based on 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over the Plaintiffs' remaining claims, all of which are based on state law.  For that reason, the court dismisses Plaintiffs' state law claims without prejudice.  The federal claims are dismissed with prejudice.

## I. PROCEDURAL BACKGROUND

The Plaintiffs filed their original complaint in August 2003.[1]  On July 12, 2005, the Plaintiffs moved for a preliminary injunction preventing the County's building inspector, Karl Mott (who is a defendant), from participating in the building permit process with respect to the Plaintiffs' construction project.  The parties later stipulated that a different County building official, James Lisonbee, would be assigned to address building permit and building code issues relating to the Plaintiffs' development and would report directly to the County Commission.

Then, on August 29, 2005, the Defendants filed their Motion for Summary Judgment on Federal Claims, which addresses the Plaintiffs' federal equal protection and due process claims[2]

---

[1]The Plaintiffs amended their complaint in August 2005 to add a claim for injunctive relief.  (See Am. Compl. (Dkt # 100) Eleventh Cause of Action.)

[2]The Plaintiffs' remaining claims (state law claims for negligence, libel, slander, intentional and negligent interference with business relationships, and violations of the Utah Constitution) are not currently before the court.

(the Eighth and Ninth Causes of Action).[3]  A delay in briefing occurred, by stipulation, to allow

further discovery, including a deposition of Mr. Mott.  The parties then completed the briefing in

September and November 2006.

The Defendants also filed Motions to Strike, in part or in their entirety, the declarations of

Plaintiffs' witnesses Frank Steed, Joan Steed, Vince Isbell, Casey Dean, and Cheryl Raines.

The court held a hearing on all pending motions in December 2006 and now issues its

order.

## II. MOTIONS TO STRIKE

### A.      Declaration of Frank Joe Steed

Defendants move to strike Paragraph 10 of Mr. Steed's declaration because it is based on

lack of foundation and is speculative.  The court agrees.  Paragraph 10 is hereby stricken.

### B.      Declaration of Casey Dean

Defendants move to strike Paragraphs 14, 16, 18, and 19 of Mr. Dean's Declaration on

the basis that those paragraphs lack adequate foundation and contain unsupported and

unqualified opinion testimony.  The court agrees in part and strikes the second and third

sentences of Paragraph 14, the last sentence of Paragraph 16, and all of Paragraphs 18 and 19.[4]

### C.      Declaration of Cheryl Raines

Defendants move to strike Paragraphs 9 and 10 of Ms. Raines' Declaration on the ground

---

[3]The Plaintiffs' Tenth Cause of Action, a stand-alone claim under 42 U.S.C. § 1983, was dismissed in an earlier order.  (See Oct. 29, 2004 Order (Dkt # 36).)

[4]The Plaintiffs submit a supplemental declaration of Mr. Dean in an effort to cure the problems of the first declaration.  The court does not consider the supplemental evidence because it was submitted without permission of the court after the time for briefing the motion for summary judgment had passed.

that they lack foundation, constitute impermissible argument, and violate the best evidence rule. The court agrees in part and strikes the last sentence of Paragraph 9 and all of Paragraph 10, with the exception of the statement "I was the President of the [Home Owner's Association]."[5]

## D.      Declaration of Joan Ann Steed

The Defendants have moved to strike almost all sixty-five paragraphs of Joan Ann Steed's Declaration.  Rather than address each of the multiple objections made by the Defendants, the court will address relevant portions of Ms. Steed's Declaration throughout the Order.  Otherwise, unless specifically addressed in this Order, the remaining challenged portions of Ms. Steed's Declaration are inadmissible for the reasons set forth in the Defendants' briefs. Accordingly the court does not rely on them.[6]

## E.      Declaration of Vince Isbell

Similarly, the Defendants have moved to strike almost all of the 180 paragraphs in Vince Isbell's Declaration.  Rather than address each of the multiple objections made by the Defendants, the court will address relevant portions of Mr. Isbell's Declaration throughout the Order.  Otherwise, unless specifically addressed in this Order, the remaining challenged portions of Mr. Isbell's Declaration are inadmissible for the reasons set forth in the Defendants' briefs. Accordingly the court does not rely on them.

---

[5]Further, the court notes that it does not rely on Ms. Raines' Declaration, which is not relevant to the issues before the court.

[6]The Plaintiffs submit a supplemental declaration of Ms. Steed in an effort to cure the problems of the first declaration.  The court does not consider the supplemental evidence because it was submitted without permission of the court after the time for briefing the motion for summary judgment had passed.

### III. FACTUAL BACKGROUND

In the Fall of 2001 (after receiving plat approval in July 2001), Joe and Joan Steed, through their companies Duchesne Land LC and Highland Development, Inc. (collectively, "Plaintiffs"), began constructing their large multi-phase residential development project in Duchesne County, Utah.  They called their development the Utah Mini Ranches (in 2003, they expanded the project to include the Duchesne Mini Ranches development) (the "Project").

This suit arises out of what the Plaintiffs characterize as a "five year course of arbitrary and discriminatory conduct, that has cost millions of dollars and that has no rational justification, other than harming the Plaintiff[s] and preventing them from developing a development that they were entitled to develop."  (Transcript of Dec. 6, 2006 Hearing ("Tr.") at 47.)  But it should be made clear that since Plaintiffs began construction, they have completed part of their development.  For the Utah Mini Ranches, Plaintiffs have received approval from the County for eight phases.  They have received eighty-seven building permits and sixty-five certificates of occupancy.  For the Duchesne Mini Ranches, they have had one phase approved, thirteen building permits issued, and nine certificates of occupancy issued.  Houses within the development have sold and marketing continues.  The Project is ongoing and construction continues.  Indeed, the Plaintiffs' Project is the fastest growing and the largest active subdivision development in Duchesne County.[7]

Still, the Plaintiffs are not happy with the pace of construction and blame much of the

---

[7]The Plaintiffs attempt to dispute this statement with Joan Steed's Declaration, Paragraphs 7 and 9.  But these paragraphs lack foundation and the court does not rely on them because they are inadmissible.  Moreover, even if the court were to rely on them, the information provided does not contradict the characterization of the Project.

delay and expense on the Defendants.  In particular, the Plaintiffs place many of their woes on Defendant Karl Mott.  Mr. Mott is a Duchesne County Building Official and is fully licensed by the State of Utah (through the Utah Department of Occupational and Professional Licensing (DOPL)) as a combination building inspector.  He is in charge of the County's small building department.  The County employs Mr. Mott, and it also employed Mr. Dean Johnson (not a Defendant) as a County building inspector.  In addition, James Lisonbee (not a Defendant) acted as a County building official.

When the Project began, Mr. Mott was in charge of the inspections and permitting necessary for the Project.  Later, in July 2005 (two years after the litigation had begun), the parties agreed that Mr. Lisonbee would take over Mr. Mott's responsibilities with respect to the Project.  But for four years, Mr. Mott was the one with whom the Defendants initially dealt when it came to acquiring building permits, passing ongoing inspections of construction materials and construction quality (all based on county building code), and obtaining certificates of occupancy.

On occasion, problems and disputes were aired to the Duchesne County Commission, and, later, to the relatively new Duchesne County Board of Appeals (it was created in September 2002).  (Mr. Mott was an ex officio (non-voting) member of the appeals board.)  Because Plaintiffs' disputes spilled over into the County Commission arena, the Plaintiffs named current or former members of the County Commission as Defendants: Larry Ross, Lorna Stradinger, and Guy Thayne.  In addition, the Plaintiffs named Roland Uresk (a Duchesne County Attorney who was involved in some of the County's disputes with Plaintiffs) as a Defendant.  All of the individuals have been named in their individual as well as their official capacities.  And, of course, Duchesne County is itself a Defendant.

The difficulty with this case is that there is no single event that Plaintiffs can hang their hats on, so to speak, to support their claims.  Rather, they recite a laundry list of incidents that in isolation do not rise to the level of a constitutional violation, but that, according to Plaintiffs, in combination form a five-year pattern of conduct that violates their equal protection, substantive and procedural due process rights.

Given the voluminous record,[8] the staggering minutiae, and the five-year span over which the alleged events occurred, the court will attempt to present only the most cogent facts in the record.

The Plaintiffs' theory appears to begin with an incident that occurred soon after the Plaintiffs received plat approval from the County in July 2001 and began building their model home.

## A.      Dean Johnson

Dean Johnson (nicknamed "Mad Dog")[9] was a County building official in the summer and fall of 2001 when he had some "run-in's" with Joan Steed and Vince Isbell, the Vice President of Highland Development, Inc. and the Project's first general contractor.  At the time, Mr. Johnson also had his own plumbing business.  Apparently, he and Karl Mott were good friends.  (See Decl. of Vince Isbell ¶ 107.)

In late summer 2001, Mr. Johnson entered the offices of Highland and approached Joan Steed.  Ms. Steed asked Mr. Johnson if he was there in his capacity as a building inspector or as a

---

[8]The parties have submitted approximately 256 fact paragraphs, at least ten affidavits or declarations (one of which contains 180 paragraphs), and more than 100 exhibits.

[9]The Plaintiffs emphasize Mr. Johnson's nickname in the apparent belief that it somehow supports their claims.

plumber.  He responded, "Both."  He then asked Ms. Steed who was doing Highland's plumbing and what products Highland was using in its construction.  He told Ms. Steed that Highland's building inspections "would go better" if Highland permitted Mr. Johnson to do Highland's plumbing and if Highland used his products.[10]

In September 2001, Mr. Johnson approached Mr. Isbell and asked who would be doing the plumbing for the Project.  Mr. Isbell responded that his company, BellSmith Construction, would be doing the plumbing.  Mr. Johnson and Mr. Isbell disagreed about whether Mr. Isbell's B-100 Contractor's license was sufficient to authorize BellSmith Construction to install the plumbing.  Mr. Johnson said that if BellSmith installed the plumbing, Highland would fail its inspection.  (Decl. of Vince Isbell ¶¶ 99-101.)  According to Mr. Isbell, "[a] heated discussion followed.  In fact, the discussion became so heated that Johnson and I nearly came to fisticuffs." (Id. ¶ 102.)[11]  Based on this confrontation, Mr. Isbell resigned on September 26, 2001, as Highland's general contractor.  (But apparently Mr. Isbell became Vice President of Highland Development, Inc., so he continued to have involvement in the Project in some capacity.)

Highland did not give its plumbing business to Mr. Johnson.  And on September 28, 2001, Highland complained to County Commissioners Thayne, Ross, and Stradinger about Mr. Johnson.  (See Ltr. from Frank Steed, President of Highland Development, Inc. to Duchesne

---

[10](Decl. of Joan Steed ¶¶ 16-19.)  The court does not rely on paragraphs twenty to twenty-three of Ms. Steed's Declaration because they lack foundation and are argumentative.

[11]The Defendants have moved to strike Mr. Isbell's Declaration in its entirety.  In his Declaration, Mr. Isbell discusses the incidents with Mr. Johnson.  On that subject, the court finds that Paragraph 105 is inadmissible for lack of foundation.

8

County Commissioners, attached as Ex. B to Joan Steed Decl.)[12]  At some point (unspecified in the record), Mr. Johnson stopped inspecting the Plaintiffs' construction.

**B.      The Alleged Conspiracy**

According to Plaintiffs, Mr. Mott began harassing Highland Development after Mr. Johnson's confrontations with Ms. Steed and Mr. Isbell.[13]

### 1.      Complaint to the Division of Occupational and Professional Licensing (DOPL)

In late September or early October, right after Mr. Johnson's confrontations with Ms. Steed and Mr. Isbell, Mr. Mott reported Mr. Isbell's potential plumbing licensing problem to the Utah Division of Occupational and Professional Licensing (DOPL).

DOPL investigated in early October 2001 and cited Mr. Isbell and BellSmith Construction, not for plumbing license problems but for doing electrical work without a license and contracting beyond the scope of their license.  The citation was upheld on appeal.

The Plaintiffs contend that Mr. Mott's complaint about the plumbing issue was "baseless," certainly because they believe it was baseless and probably because they were not actually cited for the plumbing issue (which is more persuasive than Plaintiffs' beliefs).  But Plaintiffs go further by implying that Mr. Mott complained to the DOPL because his friend Dean Johnson had been spurned by Ms. Steed and Mr. Isbell.  There is no direct evidence of Mr.

---

[12]The court includes this letter in the record only to show that a complaint was made to the County Commissioners.  The content of the letter, to the extent the Plaintiffs present it for the truth of the matter, is inadmissible hearsay, irrelevant, and/or lacking in foundation.

[13]The Plaintiffs proudly refer to Mr. Johnson's confrontations with Ms. Steed and Mr. Isbell as a "shakedown."  The court finds this an inappropriate term given the thin evidence in the record and the fact that Mr. Johnson is not even a Defendant in this suit.

Mott's motive for filing the complaint.  The only facts Plaintiffs can point to are the facts that

Mr. Mott and Mr. Johnson are good friends and that the complaint was filed right after Mr.

Johnson's confrontation with Ms. Steed and Mr. Isbell.

The Plaintiffs further allege that Mr. Mott's complaint was "the first of several baseless

complaints to the [DOPL], based specifically on allegations which had come from Johnson."

(Pls.' Opp'n Mem. at p. ix.)  The Plaintiffs rely on Mr. Isbell's Declaration, Paragraphs 143-146,

to support their allegation.  But the court finds that Paragraphs 143 and 145 are not admissible

primarily because they lack foundation, are argumentative, and are vague.  The last half of

Paragraph 144 (beginning with the phrase "claiming to be just dropping by for a visit") is

inadmissible based on lack of foundation, lack of personal knowledge, speculation, and hearsay.

And the last sentence of Paragraph 146 is inadmissible as hearsay.  In short, Plaintiffs do not

have evidence of a "series of baseless complaints made by Mott," much less any connection

between such purported complaints (which are not identified) and Mr. Johnson's confrontation.

Accordingly, this aspect of the Plaintiffs' theory is simply not documented.[14]

---

[14]To the extent that Plaintiffs might contend that other portions of the voluminous record, which have not been cited, support their assertion that Mr. Mott campaigned to harass the Plaintiffs through baseless complaints to the DOPL, the court declines to rummage through the record to pull up other possible citations.  See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995) ("Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'") (quoting Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1025 (10th Cir. 1992)); Local Rule DUCivR 56-1(c) ("Each fact in dispute must be numbered [and] must refer with particularity to those portions of the record on which the opposing party relies").

## 2.      The Lumber Grading Issue

### a.      Flooring Issues in 2001-2002

In November 2001, Mr. Mott inspected a home under construction in the Utah Mini Ranches development.  During that inspection (apparently a foundation and framing inspection), he discovered[15] that Highland was using what he characterized as ungraded and unstamped plywood and oriented strand board (OSB) on the floors of the cabins Highland was constructing.

According to the Defendants, ungraded and unstamped plywood and OSB lack a grade from a recognized inspection agency certifying that the material meets its minimum standards.  The lack of a grade or stamp most likely indicates some deficiency in the product.  For example, deficiencies could include a problem with the glue holding the layers of wood particles together or the load strength of the panels.  Major wood mills sell this product at greatly reduced prices from graded and stamped product.  Moreover, the Uniform Building Code (which Duchesne

---

[15]Highland claims that Mr. Mott falsely stated he was not aware of Highland's use of ungraded and unstamped construction materials until November 2001.  (See Pls.' Mem. Opp'n at vii.)  To support its contention, Highland points to a document attached as Exhibit D to Mr. Isbell's Declaration.  According to Highland, that document supports the proposition that "[t]he County, through Karl Mott, knew at the beginning of construction in the Spring of 2001 that HDI was using some materials that did not have grade stamps.  Mott's April 2001 letter plainly states as much."  (Id.)  But the document Highland relies on does not support the proposition.

First, the document is not a letter.  Second, Highland incorrectly assumes that the document (which does discuss suspected and known violations relating to use of ungraded and unstamped materials) was drafted in April 2001.  Highland bases its assumption on a vague statement on the exhibit that says "Issued 4/5/01."  But Mr. Mott, during his deposition when Highland's attorney was attempting to authenticate the document, said the document "appears to be a breakdown of when inspections was [sic] conducted on specific permits. . . . [The statement "Issued 4/5/01" represents] the date that the permit was issued. . . . I don't even have a date when this document was prepared."  (Mott Dep. Vol. II at pp. 393-94, attached as Ex. 4 to Pls.' Mem. Opp'n.)  Highland has not presented any evidence that Mr. Mott had the relevant knowledge in April 2001 and so it cannot support its suggestion that Mr. Mott had no problem with Highland's lumber until after his friend Dean Johnson did not receive a plumbing contract.

County adopted in 1998)[16] contains a section requiring a minimum quality of certain building materials and requiring a certain grade quality and a stamp (or other approved documentation) indicating such a grade:

> 2304.1 Quality and Identification.  All lumber, wood structural panels, particleboard, structural glued-laminated timber, end-jointed lumber, fiberboard sheathing (when used structurally), hardboard siding (when used structurally), piles and poles regulated by this chapter shall conform to the applicable standards and grading rules specified in this code and shall be so identified by the grade mark or certificate of inspection issued by an approved agency.

(Uniform Building Code § 2304.1, attached as Ex. 1 to Decl. of Karl Mott (emphasis added).)

Mr. Mott was concerned with quality assurance and the structural integrity of the buildings, and on November 1, 2001, he sent a letter to Joe Steed at Duchesne Land LLC regarding the building materials.  He stated, "As I have been conducting the foundation and framing inspections on the buildings now under construction within your subdivision, I have noted that the grade [markings] have been defaced to prevent clarity or are not present at all on the sheathing and lumber products."  (Nov. 1, 2001 Ltr. from Karl Mott to Joe Steed, Duchesne Land LLC, attached as Ex. 1 to Mott Aff.)  He noted that the buildings under construction would not pass inspection unless properly graded and stamped materials were used or he received more information assuring him of the existing materials' quality.  He said that without markings, he had "no clue as to the structural capacity of the panel or it's [sic] intended use." (Id.)  He also asked for "a listing for this product from it's [sic] manufacture[r]."  (Id.)

---

[16]Duchesne County's Ordinance # 98-141 (effective February 9, 1998) created the County's Department of Building Safety and adopted codes and standards, including the Uniform Building Code as promulgated by the International Conference of Building Officials, with some specified amendments.  (See Ex. 1 attached to Aff. of Roland Uresk.)

Mott insisted on certification from the manufacturer.  According to him,

> [t]he only person that can certify any plywood product, lumber product, is the
> manufacturer of the product. . . .  The manufacturer is required to have an
> independent inspection agency certify their material.  The way they do that is the
> certified inspection agency oversees the inspection process in the manufacturing.
> . . .  The documents I received from the manufacturer tells me they will stand
> behind that material if it should fail. . . . That's just what the code requires.  That's
> the whole point of stamped and graded material. . . .  It's a question of public
> health because the paneling is built to a standard.

(Mott Dep. Vol. I at 56:3-13, 58:2-12.)

Highland buys many of its building materials in bulk – including plywood, OSB, and T1-11 siding.  These materials are purchased by Highland through its supplier, Mason Forest Products.  The materials, which are shipped to Highland in bulk via railcar, are, according to Highland, "shop grade or better."  (Isbell Decl. ¶ 34.)[17]  In Mr. Isbell's opinion, "shop grade" materials do not have stamps on them because they contain cosmetic defects.  He further opines that "[t]he lack of 'Shop' grade stamp does not make the materials 'ungraded' in the sense that they are defective for lack of quality or structural integrity."  (Id. ¶ 37.)

Highland concedes that most of the individual pieces of lumber were not stamped.  But it contends that the plywood came in bundles of 44 pieces (a "bunk" is a bundle of plywood containing 44 pieces), and that each bundle contained a tag indicating that the materials were at

---

[17]For the last fifteen years, Mr. Isbell has been in construction management, specializing in, among other things, material purchasing.  He has special training and certifications in the construction and lumber grading industries.  In particular, he is qualified by the American Lumber Standards Committee to grade lumber and affix grade stamps/marks to that lumber. (Isbell Decl. ¶¶ 11, 15, 17.)  For these reasons, and because Mr. Isbell was a general contractor for the Project and is the Vice President of Highland (id. ¶¶ 21-22), the court denies Defendants motion to strike Paragraphs 34, 36, 37, and 38 based on lack of foundation.  (But the court does strike the portion of Paragraph 38 that sets forth a legal conclusion regarding the International Residential Code.)

least shop grade.  (Isbell Decl. ¶ 35.)  Still, the record does not indicate that Mr. Mott (or anyone

else from the County) knew about, much less inspected, the wood when it was still in "bunks."

Also, contrary to Highland's assertion, there is no admissible evidence that Mr. Mott, or anyone

else from the County building department, knew from the beginning of the Project that Highland

was using some material that did not have grade stamps.[18]

Highland contends that, in response to Mr. Mott's November 1, 2001 letter, it provided

evidence of the integrity of these materials on December 14, 2001.  On that date, Highland

forwarded two letters to Mr. Mott.

The first letter that Highland gave Mr. Mott was dated December 13, 2001, and was

drafted by an employee of Mason Forest Product's sales department and addressed to Joe Steed.

It says:

> We sell this 3/4 plywood country wide. The application of this product can be
> used for flooring or as the job engineer see's [sic] fit.  We sell this product to cash
> and carry retail stores in Dallas Memphis and New Orleans.  We also sell to box
> and container companies in Dallas and Burleson, TX. We sell this product by
> railcar to California.

(Dec. 13, 2001 Letter from John Whitaker, Sales Department, Mason Forest Products, to Joe

---

[18]Mr. Isbell contends in his Declaration that "Mott was well-aware [sic] from the beginning of construction [Spring 2001] that [Highland] was using these unstamped materials for flooring and external siding purposes."  (Isbell Decl. ¶ 39.)  Many of Mr. Isbell's statements in Paragraph 39 lack foundation and personal knowledge, in part because the exhibit to which he cites in support of his statement does not provide support for the reasons set forth in note 14, supra.  In some instances, he provides no citation whatsoever and lays no foundation about why he would have personal knowledge regarding what Mr. Mott knew or understood.  Paragraph 32 of Mr. Isbell's Declaration is also troublesome.  He claims that he informed Mr. Mott in the spring of 2001 "that the materials were labeled in bulk as shop grade."  But even if Mr. Isbell informed Mr. Mott of such a fact, the timing of such a statement is not supported because the "letter" allegedly written by Mr. Mott and supposedly raising the grading and stamping issue in the first place simply does not exist.

14

Steed, attached as Ex. B to Isbell Decl.)  This letter is not written by a representative of the

manufacturer (as Mr. Mott had requested).  Rather, Mason Forest Products (MFP) is a supplier.

Also, the letter was written by a sales department representative and says nothing whatsoever

about the structural integrity of the plywood.[19]

In the second letter, also dated December 13, 2001, Troy Ostler (a professional engineer

with CIVCO Engineering, Inc., who was hired by Highland for the Project), addressed plywood

grading:

> I have inspected the 3/4" plywood currently being used in the construction of the
> homes in the Utah Mini Ranch development and stored in your warehouse.  This
> plywood does not carry a grading stamp.  I am writing this letter as certification
> that this plywood meets or exceeds the structural requirements for the [APA –
> Engineered Wood Association] for use in the flooring for these homes.

(Ex. 2 to Mott Aff.)  Mr. Mott, after consulting with Robert Downard at the DOPL (Mr. Mott's

supervising agency), did not accept Mr. Ostler's certification as sufficient.  In Mr. Downard's

February 1, 2002 letter to Mr. Mott, he wrote:[20]

---

[19]On January 31, 2005 (more than three years after the grading issue was raised),
Highland obtained another letter, apparently written by the same individual from Mason Forest
Products, that says:

> All 3/8 siding and all 5/8 siding sent to you has been shop grade or better.  All bundles
> are labeled shop grade.  All material sent to you in Batesville, MS and Duchesne, UT
> from us indicating 3/8 & 5/8 siding has all been shop grade or better.  You have not been
> sent a lesser grade of the material.

(Jan. 31, 2005 Letter from John Whitaker, Mason Forest Products, to Joe Steed, attached as Ex.
C to Isbell Decl.)   This letter does address the integrity of the materials, but the source of the
letter is not what Mr. Mott requested in his November 2001 letter (he asked for the
manufacturer's certification).

[20]The court does not treat Mr. Downard's opinion as an expert opinion or a statement
about the truth of the matter but rather as a basis for Mr. Mott's decision to reject Mr. Ostler's
certification.

[Mr. Ostler] cannot certify the plywood after the fact using the UBC [Uniform Building Code] guidelines.  His certification at this point has primarily consisted of visual inspection of the finished product. . . .  Given [the requirements in UBC § 23.208 regarding manufacturer grading, stamping, and warranties of plywood], there would be no way for a professional engineer not involved in the manufacturing process and having access to the specific materials and design of the plywood to certify that the plywood meets or exceeds the APA standards.  Only the qualified inspector and testing agency overseeing the manufacturing of the product can certify the plywood.  Without knowing the species group classification or span rating of the wood, the glue bond type, or other specific details of its construction, certifying a panel of plywood would be impossible.  Visual inspection would not suffice.

Using this plywood in a structure creates a public welfare and safety issue.  Plywood not conforming to the Uniform Building Code should not be allowed for use in a residence or commercial building.  To allow its use could subject the inspector to a licensing disciplinary action by the Division.

(Ex. 3 to Mott Aff.)

Mr. Mott and Highland continued to debate the issue in early 2002.  Highland characterizes the dispute as "manufactured and phony."  (Pls.' Mem. Opp'n at x.)

On February 6, 2002, Mr. Mott told Highland that Mr. Ostler's and MFP's letters were not sufficient,[21] and wrote in a letter that "it is required that all work on the existing buildings be stopped until such time that methods and materials can be determined that will bring your buildings into code compliance."  (Feb. 6, 2002 Letter from Mott to Joe Steed (emphasis added), attached as Ex. 3 to Mott Aff.)

Highland continued its construction using the materials that were questioned by the County without providing the requested documentation.  On May 7, 2002, the County sent a

_____

[21]Apparently the Ostler and MFP letters addressed the plywood, but Highland never addressed the structural integrity of the OSB products.  (See May 7, 2002 Notice to Defendants, attached as Ex. 4 to Mott Aff.)

16

Notice to the Defendants warning that the building department would post "stop work orders"

(SWO's) if issues regarding use of the ungraded and unstamped materials[22] were not resolved.

(See Ex. 4 to Mott Aff.)  The letter further stated that:

> If these issues are not resolved, this department will be required by Duchesne
> County Code section 15.04.040, to issue a CEASE AND DESIST ORDER of all
> construction on lots 183, 142, 181, 114, 171, 97, 172, 110, and 79 and the
> commercial building located on what will be known as lot 246 of phase 6.

(Id. at p. DC01067.)

On May 9, 2002, the County Commission held a working meeting to discuss the issues

raised in Mr. Mott's Notice to Highland.  Under a provision of the building code that allowed

alternative materials in certain circumstances, Highland proposed to have its engineer design and

certify a system that would meet or exceed the structural integrity the building code called for

(that particular system related to the flooring, but it still addressed the more universal problem of

ungraded and unstamped materials).  (See Minutes of May 9, 2002 County Commission Working

Meeting at 1-2, attached as Ex. 10 to Pls.' Mem. Opp'n.)  Apparently the County and Highland

reached an agreement that a certified engineering plan would be acceptable as an alternative to

strict building code requirements.  (See, e.g., id. at 3;  May 14, 2002 letter from Highland's

attorney to County Commissioners (Ex. 11 to Pls.' Mem. Opp'n) (memorializing what Highland

believed the agreement contained);  May 31, 2002 letter from Mott to Duchesne Land LLC (Ex.

---

[22]The Defendants contend that the materials were never in violation of county building codes, so the entire basis for Mr. Mott's enforcement efforts was false.  But whether Mr. Isbell or Mr. Mott was correct seems beside the point for purpose of the court's analysis.  The court is determining whether Mr. Mott's and the County's actions rise to the level of a constitutional violation.  The court is not concerned with the issue of whether the Defendants were "right." The court is not acting as a super appeals tribunal.

17

12 to Pls.' Mem. Opp'n) (noting that during May 9, 2002 meeting, the County agreed that Highland could use an "alternate floor system" if the design was approved by the County).)

On June 3, 2002, Mr. Ostler (Highland's Engineer) sent Mr. Mott a letter certifying Highland's alternative flooring plan using the ungraded and unstamped plywood and OSB in Mr. Steed's warehouse. Attached to the letter was a one-page stamped and certified plan. (See Ex. 13 to Pls.' Mem. Opp'n.) But Mr. Mott did not accept Mr. Ostler's certified plan as it was submitted. Rather, he required that the plan be accompanied by engineering calculations that could be verified by an independent engineer.

Highland asserts that the engineering calculations were not necessary because a licensed engineer had certified the plan, and that Mr. Mott had never before required peer review of any certified engineering plan. Highland further asserts that because Mr. Mott had no ability to read the calculations himself (he was not an engineer), he was requesting unneeded calculations arbitrarily, in an effort to harass, delay, and single out Highland. Highland's attempt to characterize Mr. Mott as unskilled when it comes to an engineered plan is not persuasive. The record demonstrates that Mr. Mott is a certified plan reviewer and has a certain level of skills that would allow him to conduct an initial review to identify more basic problems. Mr. Mott does not profess to be an engineer. But neither is he a rubber stamp. Rather, he is the gatekeeper with specialized training and experience who is supposed to make a judgment call. His initial reaction to Mr. Ostler's one-paragraph description of the flooring plan and one-page plan was that the package did not contain even the basic foundation of information necessary to conduct an initial review. Nothing in the record suggests that Mr. Mott requested the calculations for arbitrary reasons unrelated to a legitimate governmental objective.

18

Highland also complained to the County because it felt that the County, or at least Mr. Mott, was reneging on the agreement reached at the May 9, 2002 County Commission working meeting.

On July 15, 2002, the County Commissioners held another working meeting.  Officials from the DOPL attended and explained their interpretation of the "alternative materials" provision of the building code.  They opined that the alternate engineering plan was not sufficient under the building code.  Mr. Mott said he now disagreed with his earlier decision to allow the alternative plan.  According to Highland, Mr. Mott sought out DOPL's contrary opinion because he was "angry" with Highland.  But the minutes[23] and his deposition testimony[24] do not support Highland's contention.

The County continued to request the engineering calculations to support Mr. Ostler's certification.  Highland did not provide any.  So on July 26, 2002, Mr. Mott wrote to Highland, essentially setting forth an ultimatum:

> As all of your houses incorporate this floor design using the unlisted 3/4" plywood, the structur[al] integrity and the life expectancy of the structure are in question.  Until a determination of the validity of this engineering attempt to

---

[23]According to the minutes, "Commissioner Thayne stated that he did not understand totally, he did not feel Karl [Mott] was ever directed to do something that was against the building code.  Karl responded that he probably was not directed, but he probably felt pressure on his own, his anger probably influenced him too."  (Minutes of July 15, 2002 County Commission working meeting at 3.)  This reference to "anger" is vague, but given the context provided by the minutes, this reference appears to mean that his "anger" (not clear to whom it is directed or why he was angry) influenced him to accept the alternative plywood construction plan (a decision which favored Highland and which he later regretted).

[24]During his deposition, Mr. Mott was asked, "You were angry at the Utah Mini Ranches, the Steeds, Mr. Isbell, weren't you?"  Mr. Mott replied, "No. I don't think so."  (Mott Dep. Vol. I at 291.)  Highland presents nothing more than speculation and is attempting to put words in Mr. Mott's mouth.

19

> incorporate this material in a structural design is determined, the county cannot
> and will not conduct final inspections that may imply approval of the use of these
> products.

(Ex. 6 to Mott Aff.)  Apparently there was no response to Mr. Mott's letter, so in early August

2002, Mr. Mott issued SWO's for several lots in the Project and revoked a final certificate of

occupancy and a temporary certificate of occupancy.

Highland appealed the SWO's to the County Commission, who heard the appeal on

August 14, 2002.  The next day, the Commission issued its decision.  (See Aug. 15, 2002

Findings and Ruling, attached as Ex. 4 to Defs.' Mem. Supp. Mot. Summ. J.)  In its Ruling, the

Commission upheld Mr. Mott's decision to issue the SWO's and reject the proposed alternative

flooring plan submitted by Mr. Ostler on behalf of Highland.  The Commission expressed

concern that no explanation had ever been given why the material was not stamped, graded, or

certified.[25]  It further noted that right before the hearing the County Commission had received an

alternative overlay solution from Engineering Services, Inc. (who apparently submitted the

proposal on behalf of Highland), which solution had been approved by Mr. Mott for use in the

houses that had already been built.  The Commission said that the Engineering Services, Inc.'s

proposal would allow Highland to correct the problem for the existing structures.  Accordingly,

the Commission lifted the SWO's "for the purpose of allowing [Highland] to implement the

approved alternative method.  If the alternate system is implemented on all the lots including the

---

[25]The court notes that the County Commission invited three building inspectors—one
each from Park City, Vernal City, and Roosevelt City—to assist it during the hearing.  The
Commission's decision noted that Mr Ivie, the Park City Building Official, "pointed out that the
reason the material was not certified is an important factor that needs to be determined."  (Aug.
15, 2002 Findings and Ruling (Ex. 4 to Defs.' Mem. Supp.) at DC00595.)

two lots where the certificate of occupancy was revoked, the Cease and Desist order and the Revocation shall be rescinded."  (Id. at DC00596.)   The Commission further noted that Highland could use Mr. Ostler's alternative flooring plan for the as-yet-unbuilt houses if Highland obtained approval from Mr. Mott.

Highland now objects to the Findings and Ruling, contending that the overlay solution required it to "install a wholly unnecessary and superfluous **third** layer of flooring material." (Pls.' Mem. Opp'n at xvii (emphases in original).)  Highland also contends that independent agency testing of the materials is "extra-statutory, and an unwarranted ratcheting up on the County's previous position that [Highland] was only required to provide an engineer's certificate regarding this matter."  (Id.)

On August 30, 2002, Highland submitted Mr. Ostler's calculations to Mr. Mott.  But Mr. Mott rejected the calculations because, according to Mr. Mott, the calculations depended on an arbitrary assignment of value to the unstamped, ungraded materials of half that of stamped and graded materials.  Highland contends that Mr. Mott was not qualified to determine whether the value assigned by Mr. Ostler was appropriate, and so it was unreasonable for Mr. Mott to reject the calculations.  After rejecting Mr. Ostler's calculations, Mr. Mott repeated the County Commission's recommendation that Highland have the grade of the materials determined by a nationally accredited testing agency.

Highland implemented the overlay solution for cabins already built.  It then proposed an alternative to agency testing and certification—in situ load testing (which is set forth in International Building Code § 1713)—to which the County agreed on September 9, 2002.  The in situ tests were performed on September 13th and 14th, 2002.  Mr. Ostler's design passed the test,

and the design was approved for use in the cabin floors with the ungraded and unstamped plywood and OSB.

            b.      Siding Issues in 2004-2005

Two years after the flooring issues were ostensibly resolved, another dispute arose, this time over siding.

Initially, based on Mr. Mott's interpretation of the building code in force at the time construction began in 2001, he approved Highland's use of shop-grade panels as external siding. At some point in 2004, James Lisonbee (another county building inspector) told Mr. Mott that the panels being used by Highland no longer bore the "shop" stamp.  Upon further review of the building code in effect in 2004, Mr. Mott learned that the state's building code (which was amended in 2002) required that all exterior wood siding products be of a graded or listed material.  Mr. Mott confirmed his interpretation with the International Code Council (ICC), which had drafted the uniform code provision adopted in 2002 by the State.  At the end of August 2004, Mr. Mott told Highland that it was no longer in compliance with the code if it used ungraded and unstamped siding panels and, further, that Highland would have to replace panels in houses built after the 2002 code change.

On January 13, 2005, Highland appealed Mr. Mott's decision to the Duchesne County Board of Appeals.  Highland did not dispute the interpretation of the existing code section, but it argued that a grace period should apply to homes built before the County (i.e., Mr. Mott) became aware of the 2002 code change (Highland did not believe it had to replace siding panels on already-constructed homes).  Highland also contends that the panels were not structural and so

were not subject to the new code requirement.[26]

The Board met to hear Highland's appeal on January 20, 2005.  Mr. Mott was the

Secretary of the Board of Appeals.  Apparently he participated in a closed executive session, but

he did not have a vote.  During the hearing, the Board decided it needed documentation from

Highland that the paneling used was at least shop grade, and so it recessed until February 3,

2005.

During the February 3, 2005 Board of Appeals meeting, Highland provided a notarized

letter from Mason Forest Products, its lumber supplier, saying that the siding material was shop

grade.  The Board accepted this letter and allowed the panels to stay in already-constructed

cabins, but only on the condition that Highland provide a ten-year warranty for each cabin,

secured by a 100% performance bond and recorded notice.

On April 13, 2005, Highland submitted an application to the Board of Appeals for a re-

hearing ("as soon as possible") of the decision requiring the performance bond.  The hearing was

held on June 2, 2005, much later than Highland would have liked.  (But Defendants point out

that Highland did not request a re-hearing until more than two months after the Board's initial

decision.)

On June 3, 2005, the County agreed to accept a letter of credit in lieu of a performance

bond.  The siding issue was settled, at least with respect to already-constructed cabins.

c.      Vince Isbell's Lumber Certification

In May 2005, Duchesne County Building Inspector James Lisonbee placed stop-work-

---

[26]It is not clear whether Highland raised the non-structural argument during the appeal.

orders on three cabins because they incorporated lumber that had not been graded.  On June 3,

2005, Vince Isbell, working for Timber On Line Inspections Inc., submitted his Lumber Grade

Certifications, requesting that the SWOs be lifted.

Plaintiff Frank Joe Steed is the registered agent for Timber On Line Inspections, Inc.

(TOLI).  Mr. Isbell worked for TOLI, certifying unmarked and ungraded lumber for use in

Highland's Project.  In his capacity for TOLI, Mr. Isbell was certified by Timber Products

Inspections (TP) to be a grader.  Mr. Isbell is a Vice President for Highland as well.  Highland

purchased the lumber certified by Mr. Isbell at TOLI.

In a June 6, 2005 letter to Highland, Mr. Mott rejected Mr. Isbell's certifications for

various reasons, some of which turned out to be incorrect.[27]  But some reasons were legitimate.

In particular, Mr. Mott noted that Mr. Isbell had a conflict of interest because he was Vice

President for Highland while certifying lumber being used by Highland.  Mr. Mott contended that

the American Lumber Standards Committee, Inc. (ALSC) "prohibits the grading by a person or

firm whose own products are subject to the inspection."  (Ex. 10 attached to Mott Aff.)  Section

3.1.6 of the ALSC Board of Review Enforcement Regulations provides that the accredited

lumber grading agency (in this case, TOLI)

> shall not be controlled by any person or firm whose own products are subject to its
> inspection and certification, nor shall the Board approve inspection services
> furnished by buyers and users for the inspection of their own purchases.  The
> inspectors of the agency shall not be employed by any lumber manufacturer or by
> any buyer of lumber or engage in any other undertaking which might conflict with
> their independent positions as inspectors.

---

[27]Highland uses the term "false" to describe Mr. Mott's reasons.  But the word "false"
connotes deception, and there is no evidence that Mr. Mott knowingly relied on incorrect
information.

(See id. (emphasis added).)

On June 27, 2005, Highland appeared before the County Commission to complain about the SWO's issued by Mr. Lisonbee.  On June 30, 2005 Mr. Mott rejected documentation from Mr. Isbell that certified grade through a process of grading of the wood already installed in the structure.  Mr. Mott noted that the ALSC regulations prohibit grading or re-grading lumber already installed in a structure.  To resolve the problem "short of tearing these units down and rebuilding, the County will accept an inspection from Timber Products, Inc. [sic] which states no plates or sills have any characteristics that would eliminate them from the minimum grade category.  . . . .  All future buildings will be required to have all lumber graded prior to being installed into the building projects."  (June 30, 2005 Letter from Mr. Mott to Mr. Isbell, attached as Ex. 11 to Mott Aff.)  Timber Products Inspection provided the requested inspection report.  After receiving certificates from Timber Products Inspection, the County lifted the SWOs.

But on July 11, 2005, Mr. Mott said the County's past acceptance of lumber mill certificates from Mr. Isbell was error.  Mr. Mott said that the from then on the County would only accept certificates that had been signed and issued by Timber Products Inspection.  On July 15, 2005, Highland again wrote to the Commission complaining about Mr. Mott's requirement (see Ex. 4 to Aff. of Roland Uresk.), but Highland did not file an appeal with the Duchesne County Board of Appeals.

### 3.    Engineering Calculations

The Plaintiffs contend throughout their brief that Mr. Mott required them to submit duplicative and unnecessary engineering calculations.  They requested more than once that he organize his files better so that they did not have to provides copies of what he already had.  They

also contend that he could not use the calculations because he was not qualified to read them. Essentially they suggest that he had no reason to request the calculations other than to impose more work and expense on the Plaintiffs.

### 4.    Mott's Treatment of Other Home Builders

Plaintiffs claim, among other things, that their equal protection rights were violated when they were treated differently than similarly situated builders.  They compare themselves to "other builders of single family homes in Duchesne County."  (Pls.' Mem. Opp'n at 1.)  They provide examples relating to large developers as well as to single owner-builders.  The record provides the following information regarding these builders.

#### a.    The Thomases' Home

Vaughn and Gayle Thomas were building a home in Duchesne County in July 2002. They were "owner-builders" (that is, they were building a single family home of their own). They submitted building plans and engineering for a flooring system that was essentially the same as the flooring system that Mr. Mott refused to accept in Highland's construction.  Mr. Mott reviewed the engineering plans and sent them a letter on July 19, 2002, stating that plywood needed to be stamped and graded.  (Ex. 18 to Pls.' Mem. Opp'n. at 7.)  But after the County agreed in August 2005 to allow Highland to use the overlay system, Mr. Mott allowed the Thomases to use the overlay system as well.  In fact, it was Mr. Ostler who provided the engineering for the overlay on the Thomases' floor, along with supporting calculations, on August 27, 2002.  (See id. at 13.)  Still, Mr. Mott did not require the Thomases to conduct any additional testing, such as in situ load testing.

b.      The Campbell Home

On January 18, 2005, the County issued a building permit to Mandy Campbell for construction of a single family dwelling.  R&C Construction, Inc. was listed as the General Contractor, and the house was to be built in the Bandanna Ranch subdivision.

Mr. Mott learned that the external siding consisted of plywood that was not fully stamped (and therefore not properly certified as grade).  While the plywood boards bore stamps indicating the manufacturer, and date and shift they were manufactured, they did not contain a full grade certification stamp.  Mr. Mott told Ms. Campbell that he needed a letter from the manufacturer certifying that the plywood was of an acceptable grade.  That letter was provided on May 27, 2005.  It stated:

> The 303-18 Fir siding produced at both Plum Creek plywood mills is APA approved and under normal situations would have the APA stamp on the back of each panel.  The only way a panel could get out of the mill without a stamp would be for the stamp to fall off the machine without the operator noticing.  All of our downfall is pulled out before it is run to pattern so I am confident the panels you received are not only APA approved but also on grade.

(Ex. 26 to Pls.' Mem. Opp'n at 15.)  Mr. Mott accepted this letter and approved use of the siding. Nothing further was required.

c.      The Mountain Home

Mr. Mott testified about another home somewhere in Duchesne County, referred to as the Mountain Home, that apparently had incorporated unstamped and ungraded OSB in the home's roof.  In his deposition, Mr. Mott recalled that he knew "of one roof in Mountain Home that they had the unstamped and ungraded O.S.B. and they put a tin roofing on, and I made the contractor install blocking to support the roofing tin so that the O.S.B. was no longer a structural element in

27

that design." (Mott Dep. Vol. I at 35-36.) The record does not indicate when this occurred.

> d.   Other Large Developers

The Plaintiffs refer to other builders who build on a larger scale in Duchesne County. But the evidence presented on that issue (Paragraphs 7 and 9 of Ms. Steed's Declaration) is inadmissible for lack of foundation. Moreover, even if the information was considered by the court, it tells the court nothing more than the fact that other large developments exist in Duchesne County. There is no evidence regarding whether these large developments are similar in any other way to Utah Mini Ranches (that is, that their building practices were or are the same as Highland's, such as the practice of using unstamped and ungraded building materials). Accordingly, the information is not helpful.

## 5.   Opinion Shopping

The Plaintiffs claim that Mr. Mott engaged in opinion shopping to find what he needed, regardless of source, to deny Plaintiffs what they believe was rightfully theirs. (See Pls.' Mem. Opp'n at xi.) The Defendants responded as follows:

> The citations Highland provides for its conclusion that Mott was "opinion shopping" do not present any opposing opinions (let alone any from organizations as respected as the [APA – Engineered Wood Association], [International Code Council], and [Western Wood Products Association]) that Mott disregarded. In fact, one of the "opinions" Highland cites is a letter from DOPL warning Mott of disciplinary proceedings if he accepts the ungraded and unstamped plywood and OSB.

(Ex. 1 to Defs.' Reply at pp. A1-9 to A1-10.)

## 6.   Mott's Public Statements

The Plaintiffs assert that Mr. Mott defamed Highland to Highland's customers and potential customers. But the question of whether he defamed Highland is a question of law going

28

to the Plaintiffs' second and third causes of action, and that issue is not currently before the court. Moreover, much of the evidence presented regarding Mr. Mott's statements about Highland—Paragraphs 108-116 and 121-123—is inadmissible because it lacks foundation, is speculative, is inadmissible hearsay, and/or contains a legal conclusion.

The Plaintiffs also assert that Mott made false statements about Highland to the local newspaper, Uintah Basin Standard, in 2002.  For example, in a July 23, 2002 article, the newspaper reported that, "Mott said when he first noticed the cabins were being constructed with 'questionable listings on the material' last November he issued a stop work order, but it was ignored."  (Ex. 38 to Pls.' Mem. Opp'n.)  Mr. Mott admitted that no official stop work order was issued in November 2001.  But the County did issue a letter in May 2002, before the article was written, that threatened a formal cease and desist order if Highland did not comply with the Building Department's requirements.  SWO's were issued, but not until August 2002, after the article was written.  Plaintiffs raise questions about the accuracy of Mr. Mott's statements to the Uintah Basin Standard, but the court makes no finding on any defamation charge.

Finally, Highland points out that Mr. Mott obtained information from the Uintah Basin Standard regarding Mr. Steed's criminal history, and then gave that information to members of the County Commission.  This occurred about the time that the alternative flooring system was at issue.

## C.      The County Commission and its Commissioners

The Plaintiffs also present a series of disjointed events relating to the Project that involve

members of the County Commission (some more peripherally than others).[28]

### 1.     Tax Assessment

In the summer of 2002, the Duchesne County Assessor set the 2002 value of each Utah Mini Ranches lot as approximately $14,950.  Duchesne Land LC appealed to the Duchesne County Board of Equalization.  The County Commission sits as the Board of Equalization.  The Board upheld the valuation.  Duchesne Land appealed to the Utah State Tax Commission.  The Commission reduced the value to $5,875 per lot.  The County Assessor appealed that ruling.

While the Assessor's appeal was pending, the Assessor issued 2003 valuations to Duchesne Lane.  The Assessor again set the value at approximately $14,950.  Duchesne Land appealed that decision to the Board.  The Board denied the appeal, but stated that "the commission has determined to honor the decision of the outcome of the state tax appeal that is on file for 2002.  Whatever is decided on those appeals for 2002 will also be made for 2003." (Oct. 29, 2003 Letter from Diane Freston, Duchesne County Clerk/Auditor to Duchesne Land LC, attached as Ex. C to Aff. of Joan Steed.)

The 2002 valuation appeal was heard, and the Tax Commission ordered the County to

---

[28]One of the events relates to the Tri-County Health Department and approval of septic systems.  Even though Larry Ross, one of the Defendants, sits on the Board of Directors of the Tri-County Health Department, there is no other definitive link to the County.  Indeed, the Tri-County Health Department is an interlocal agency created by Duchesne, Daggett, and Uintah Counties under the laws of Utah.  It is a separate entity, not an arm of the County.  Under Utah law, such interlocal entities may sue and be sued in their own right.  Utah Code Ann. § 11-13-204(1)(a)(i)(B).  But the Health Department is not a defendant in this matter.  Accordingly, the activities of the Tri-County Health Department are simply too far removed from this case to be relevant.  And Mr. Ross's membership on the Health Department's Board is too far removed to allow the Plaintiffs' speculation that his alleged animosity toward the Plaintiffs somehow drove the Tri-County Health Department's decisions that allegedly harmed the Plaintiffs.

reduce the value of each lot to approximately $6,438.  But the Board did not apply the $6,438 value to the 2003 assessment.[29]  Duchesne Land appealed the 2003 assessment.  On September 26, 2005, the Utah State Tax Commission ordered the County to reduce the value of the lots to approximately $4,750 per lot.

### 2.       Model Home Appeal

On May 9, 2003, Highland wrote to Ronald Uresk, attorney for the County, demanding that the County reconsider the Building Department's denial of a model home building permit.  (Ex. X to Isbell's Decl.; Isbell Decl. ¶149.)[30]  The County did not respond.  On May 19, 2003, Highland sent Mr. Uresk a follow-up fax with a demanding, irritated tone.  (Ex. Y to Isbell's Decl.)  The County did not respond.  Then on June 16, 2003, Highland wrote a letter to the County Commissioners regarding various issues, including the County's lack of response to the model home permit.  On June 24, 2003, Highland wrote a third letter to Mr. Uresk, with no response.  On June 30, 2003, Highland wrote a fourth letter to Mr. Uresk again asking for information and requested an appeal.  The matter was briefly discussed at the June 30, 2003 County Commission working meeting.  Highland did not receive an opportunity to have the decision heard by the Board of Appeals.

### 3.       Statements made by County Officials

Highland presents a series of alleged statements by County Officials that purportedly demonstrate animosity toward the Plaintiffs.

---

[29]The court strikes Paragraph 62 of Ms. Steed's Declaration on the basis that is inadmissible double hearsay.

[30]Paragraph 148 of Mr. Isbell's Declaration is stricken for the reasons set forth in the Defendants' motion to strike Mr. Isbell's Declaration.

For example, Ms. Steed vaguely asserts that, "[o]n one occasion before a County Commissioner's meeting, [County Commissioner Lorna] Stradinger told me to 'tell Vince to keep his mouth shut.'" (Decl. of Joan Steed ¶ 42.)[31]

Mr. Isbell vaguely asserts that both Commissioners Stradinger and Ross treated him with open hostility on several occasions.  (Decl. of Vince Isbell ¶¶ 168, 171.)[32]  For instance, he says Ms. Stradinger would often talk down to him, interrupt him, yell at him, or tell him to "shut up." Such occurrences happened both in working meetings and open public meetings of the County Commission.  For the most part, such occurrences happened during or about the time of the flooring issue.  As for Commissioner Ross, Mr. Isbell says that, in a 2005 meeting, Mr. Ross accused him of purposefully grading lumber in an improper fashion, and accused him of having a conflict of interest when he was grading lumber that would be used by Highland.  Mr. Ross accused him of these items in an open meeting and in front of the local press.  (Id. ¶¶172-73.) Then, according to Mr. Isbell, Daryl Grant (not a Defendant), a Board of Appeals member in 2005, admitted that he voted against Highland not based on the merits of the appeal but because he disliked their attitude.  (Id. ¶ 174.)  Finally, Mr. Isbell asserts that Mr. Mott told him that Duchesne County "would grow with or without Joe Steed."  (Id. ¶ 165.)  Many of these statements are presented without any context.

Mr. Steed asserts that Duchesne County Commissioner Rod Harrison (who is not a defendant in this action) stated, during a 2006 County Commission meeting, that "the Steeds

---

[31]The remaining statements in Ms. Steed's declaration on this subject (Paragraphs 41 and 43-48) are inadmissible on the basis that they are hearsay and/or lack foundation.

[32]Paragraphs 159-164 and 166 of Mr. Isbell's Declaration are stricken on the basis that they lack foundation, are argumentative, and/or are speculative.

won't be building any more homes up on the mountain.  They won't be getting any more phases

approved."  (Decl. of Frank Joe Steed ¶ 9.)[33]

### 4.      Appeals Board

The County created the Duchesne County Board of Appeals in 2002.

On July 6, 2004, Duchesne Land submitted two applications for appeals to the Board of

Appeals.  The next day, Mr. Mott (who is the Secretary for the Board of Appeals) returned them

to Duchesne Land, stating that the applications were incomplete:

> Please note that you have not specified what you want to appeal or and
> have not identified the lot(s) by lot number and/or address of the project subject to
> appeal.  Therefore the applications must be returned as incomplete.
>
> Please site [sic] the section of the code to which you wish to appeal and
> identify the project for which the appeal applies.

(July 8, 2004 Letter from Mr. Mott to Mr. Steed, Duchesne Land, at DC02305, attached as Ex.

45 to Pls.' Mem. Opp'n.)  The Plaintiffs claim that Mr. Mott's rejection of their applications was

arbitrary.  They never followed through on Mr. Mott's request to clarify the nature of their

appeals.

The Plaintiffs also complain that, in general, Mr. Mott, as Secretary of the Board and *ex

officio* member, took part in an appeal of a decision he made, and that made the Board of

Appeals a biased tribunal.  But Mr. Mott is not allowed to vote.  Defendants also note that, by

making Mr. Mott an ex officio member of the Board and its nonvoting secretary, the County

followed the organization set forth in the Uniform Building Code, which provides in relevant

---

[33]Paragraph 10 of Mr. Steed's Declaration is stricken on the basis that it lacks foundation
and is argumentative.

33

part, that "[t]he building official shall be an ex officio member of and shall act as secretary to said board but shall have no vote on any matter before the board."  (Uniform Building Code § 105.1 (Vol. 1 1997), attached as Ex. 7 to Defs.' Reply.)[34]

## IV. ANALYSIS

### A.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c);  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  Liberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

---

[34]Other evidence in the record regarding the South Duchesne Culinary Water Company, a delay to receive a bond hearing, and enactment of the County Commission's Resolution 05-15 (establishing a $400 filing fee for Board of Appeals hearings, effective July 1, 2005) —simply does not create material issues relevant to the matter at hand.

**B.      Equal Protection "Class of One" Claim**

The Plaintiffs have alleged a claim of discrimination under the Fourteenth Amendment's

Equal Protection Clause.  But none of the Plaintiffs is a member of a suspect or quasi-suspect

class (for example, they do not claim discrimination on the basis of race, ethnicity, or gender).

Instead, they are proceeding under the "class of one" theory expressly recognized by the United

States Supreme Court in Village of Willowbrook v. Olech, 528 U.S. 562 (2000), and since

applied by the Tenth Circuit:

> In the paradigmatic class-of-one case, a public official inflicts a cost or burden on
> one person without imposing it on those who are similarly situated in material
> respects, and does so without any conceivable basis other than a wholly
> illegitimate motive. . . .  The paradigmatic "class of one" case, more sensibly
> conceived, is one in which a public official, with no conceivable basis for his
> action other than spite or some other improper motive (improper because
> unrelated to his public duties), comes down hard on a hapless private citizen.

Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1209 (10th Cir. 2006).  But courts,

including the Tenth Circuit, are cautious when analyzing class-of-one claims:

> Most circuits, including this one, have proceeded cautiously in applying the
> theory, sensitive to Justice Breyer's warning [in Olech] against turning even
> quotidian exercises of government discretion into constitutional causes.  An
> approach that reads Olech too broadly could transform the federal courts into
> "general-purpose second-guessers of the reasonableness of broad areas of state
> and local decisionmaking: a role that is both ill-suited to the federal courts and
> offensive to state and local autonomy in our federal system."  Such a pervasive
> threat of federal litigation could straitjacket local governments that have neither
> the capacity to document the reasoning behind every decision nor the means to
> withstand an onslaught of lawsuits.

Id.  (citations omitted).

A class-of-one equal protection claim has two essential elements.  First, the plaintiff must

establish that the government official or entity intentionally treated it differently from those who

are similarly situated.  Grubbs v. Bailes, 445 F.3d 1275, 1282 (10th Cir. 2006).  Second, the

plaintiff must show "that the official action was objectively irrational and abusive . . . ."  Jicarilla

Apache Nation, 440 F.3d at 1211 (emphasis in original).

### 1.    Similarly Situated

The key to the first element of a class-of-one claim is to establish a similarly situated

comparator.  The question of whether individuals are similarly situated is a factual question.  But

"a court may properly grant summary judgment where it is clear that no reasonable jury could

find that the similarly situated requirement has been met."  McDonald v. Village of Winnetka,

371 F.3d 992, 1002 (7th Cir. 2004).  In this case, the Plaintiffs have not, as a matter of law,

satisfied the similarly situated requirement of a class-of-one equal protection claim.

"The requirement that a plaintiff show that similarly situated persons were treated

differently 'is especially important in class-on-one cases.'"  Jicarilla Apache Nation, 440 F.3d at

1212.  Plaintiffs must demonstrate similarity "in all material respects," and "cannot prevail if

there is any material difference between it and allegedly similarly situated parties that relates to a

governmental interest."  Id. at 1212-13 (emphasis in original).  This is a heavy burden.  See, e.g.,

id. ("when the class consists of one person or entity, it is exceedingly difficult to demonstrate that

any difference in treatment is not attributable to a quirk of the plaintiff or even to the fallibility of

administrators whose inconsistency is as random as it is inevitable") (emphasis added);  Jennings

v. City of Stillwater, 383 F.3d 1199, 1214 (10th Cir. 2004) ("It is . . . imperative for the class-of-

one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of

the favored class.");  Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005) (class-of-one

plaintiff must show that "no rational person could regard the circumstances of the plaintiff to

differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy"); Purze v. Village of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002) (requiring class-of-one plaintiff to show it is "*prima facie* identical [to the proposed comparator] in all relevant respects") (emphasis added).

Here, Plaintiffs contend that they should be compared to "other builders of single family homes in Duchesne County." (Pls.' Mem. Opp'n at 1.) But Plaintiff's definition of "similarly situated" in a class-of-one case is too broad, as discussed below. Also, Plaintiffs have not presented compelling evidence of a truly similarly situated comparator. See Jennings, 383 F.3d at 1215 ("the multiplicity of relevant (nondiscriminatory) variables requires [a class-of-one] plaintiff to provide compelling evidence of other similarly situated persons who were in fact treated differently.").

The Tenth Circuit has emphasized how narrowly the favored class must be defined. In Jennings, to demonstrate its point, it approvingly quoted a District of Massachusetts opinion dealing with a class-of-one claim challenging a zoning decision:

> "It might be suggested that all applicants should be considered 'similarly situated' simply because they had all made requests for waivers of the dead-end street length regulation.  But that is so broad a definition of "similarly situated" that it is not useful for equal protection analysis; it could be applied to any group of applicants where, looking back, one could see that there had been some who succeeded and some who failed.  For example, high school students whose applications to a particular college were rejected could allege that they were being treated differently from the 'similarly situated' fellow students whose applications were accepted.  In the example, *one would want to know a good deal more about the merits of individual applicants before deciding who was similarly situated to whom.*"

Jennings, 383 F.3d at 1214 (underline emphasis added) (quoting Lakeside Builders, Inc. v. Planning Bd. of the Town of Franklin, 2002 WL 31655250, at *3 (D. Mass. Mar. 21, 2002)

(citations omitted; italicized emphasis added by Tenth Circuit)).

The Second Circuit has also noted that, "[i]n order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." Neilson, 409 F.3d at 104 (emphasis added). The Neilson court required the class-of-one plaintiff to show that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." Id. at 105 (emphasis added). This narrowly defined standard is consistent with the language in Jennings, in which the Tenth Circuit said that,

> unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

Jennings, 383 F.3d at 1210-11.

Defendants emphasize that the Plaintiffs' Project is the fastest growing and largest active subdivision development in Duchesne County. More importantly, the Defendants emphasize that this large development was slated to use railcar loads of unstamped and ungraded lumber in the construction of multiple single family homes for sale to third parties. Yet Plaintiffs insist that they are no different than the owner/builders in the Thomas, Campbell, and Mountain Home situations. That is not a fair comparison. The scale of the Project alone is sufficient to

distinguish the Plaintiffs from the three individual home builders.

Perhaps a comparison to other large developers in Duchesne County would be more appropriate, but there is very little evidence in the record to equate these vaguely defined developers to the Plaintiffs.  See, e.g., Purze v. Village of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002) (holding in class-of-one case that prospective developers were not similarly situated to other developers because they were not prima facie identical in all relevant respects: i.e., "the allegedly similarly-situated individuals in this case requested different variances than the [plaintiffs] requested; submitted their plats during different time periods; and had their plat requests granted by different and previous Boards.").  Here, there is no evidence that the other large developers planned to use, much less actually used, unstamped and ungraded lumber in their construction.

Plaintiffs claim that the Defendants irrationally treated the Project differently than the owner/builders (the Thomases, Mandy Campbell, and the Mountain Home) because: (1) Highland's letter from Mason Forest Products was not accepted by Mr. Mott whereas Ms. Campbell's letter was accepted without question; (2) Highland was required to do additional testing on its flooring system whereas the Thomases were not; and (3) Mountain Home was not subjected to the same questioning attitude Highland received from the County.

Looking at the Mason Forest Products letter, the Plaintiffs incorrectly conclude that the letter from a supplier is equivalent to a letter from the manufacturer.  Ms. Campbell presented a reliable letter from the manufacturer, just as Mr. Mott requested.  Plaintiffs did not present a letter from the manufacturer, instead choosing to argue the point with the County.  Given Mr. Mott's explanation for relying on a manufacturer rather than a supplier, his request for

39

certification from the manufacturer was reasonable.  In short, the Plaintiffs and Ms. Campbell are not similarly situated.

As for the additional testing requirement, it appears from the record that the agency certification and testing suggested by the County in its Findings and Ruling (see Ex. 4 to Defs.' Mem. Supp.) was for houses that were not going to use the overlay system.  And then it was Highland that proposed the alternative *in situ* load testing.  That issue appears to be different than the issue raised by construction in the Thomas home.  So the Plaintiffs and the Thomases are not similarly situated.

And in the Mountain Home situation, the record does not indicate when the problem arose, so the court has no point of reference to determine whether that situation was similar to the Plaintiffs'.  Moreover, it appears that Mr. Mott did require the builder to install additional support to remedy the problem of questionable structural integrity.  It is not as if Mr. Mott simply let the problem go.

Plaintiffs have failed to satisfy their burden to establish that they are similarly situated to a relevant comparator, or even if they were similarly situated, that they were treated differently in any material respect.  "[A] complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### 2.    Objectively Irrational and Abusive Government Action

In the Tenth Circuit, pretext, or subjective ill will, is not relevant to a class-of-one claim. If there is evidence of a rational government basis for the treatment, then the class-of-one claim fails as a matter of law.  Jicarilla Apache Nation v. Rio Arriba County, 440 F.3d 1202, 1210-11

(10th Cir. 2006) ("Because a class-of-one plaintiff must show that the official action was

<u>objectively</u> irrational and abusive, . . . pretext is not an issue.") (emphasis in original).  Although

some circuits have expressly required a showing of subjective ill will, the Tenth Circuit has not

done so.  Instead, the Tenth Circuit, in <u>Jicarilla</u>, said that it was not necessary to resolve the issue

because

> [e]ven if subjective ill will is a necessary condition for a class-of-one claim, it is
> not a sufficient one.  <u>See</u> <u>Barstad v. Murray County</u>, 420 F.3d 880, 887 (8th Cir.
> 2005); <u>Olech v. Village of Willowbrook</u>, 160 F.3d 386, 388 (7th Cir. 1998) ("[A]
> tincture of ill will does not invalidate governmental action."), <u>aff'd</u> <u>Olech</u>, 528
> U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).  If there was an <u>objectively
> reasonable basis for the Defendants' actions</u> in this case, the district court did not
> err in granting summary judgment in favor of the Defendants on that ground . . . .

<u>Id.</u> (emphasis added)

Even if the court were to find that the Plaintiffs have established similarly-situated

comparators, the evidence in the record points to an objectively rational basis for the County's

and Mr. Mott's decisions and actions relating to the Plaintiffs.  Plaintiffs certainly disagreed with

the County's interpretation and application of the building codes.  And Plaintiffs clearly believed

that they were in the right, so any questioning of their position was offensive to them.  They

continue to attribute ill will to the County officials (a factor that is not relevant in the Tenth

Circuit).  But the events laid out in the parties' briefs (in excruciating detail) still do not rise to

the level that would justify sending this issue to a jury.

## C.      Due Process Claims

Although the nature of the Plaintiffs' due process claim is not entirely clear from their

Complaint, they assert in their brief that they are bringing a substantive as well as a procedural

due process claim against the Defendants.  The court will address both types of claims.

According to the Tenth Circuit,

> The Fourteenth Amendment proscribes a state from, among other things,
> depriving a party of "property without due process of law."  U.S. Const. amend.
> XIV, § 1.  Procedural due process ensures the state will not deprive a party of
> property without engaging fair procedures to reach a decision, while substantive
> due process ensures the state will not deprive a party of property for an arbitrary
> reason regardless of the procedures used to reach that decision.

Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000).  For both due

process claims, as a threshold matter the court must determine whether the Plaintiffs have

established a protectible property interest.[35]  See, e.g., id. ("to prevail on either a procedural or

substantive due process claim, a plaintiff must first establish that a defendant's actions deprived

plaintiff of a protectible property interest"); Jennings v. City of Stillwater, 383 F.3d 1199, 1205

(10th Cir. 2004) ("When a due process claim is premised on a deprivation of property, the court

first must determine the precise nature of the property threatened by the state.").

    **1.**        **Substantive Due Process**

        a.        <u>Protectible Property Interest</u>

Plaintiffs here contend that they have a protectible property interest in "using and

developing their property" and "in certain permissions which were unconstitutionally withheld or

conditioned by the County."  (Pls.' Mem. Opp'n at 15.)  During the hearing, they clarified,

somewhat, that they seek to protect their "right to receive appropriate permits and occupancy

certificates and so forth when [they] have complied with the requirements of the law."  (Dec. 6,

2006 Hearing Transcript ("Tr.") at 32.)  For the reasons stated below, the court finds that the

_____

[35]A plaintiff may also allege a life or liberty interest, but such a situation is not applicable
here.

Plaintiffs have not established a protectible property interest.

"The [United States] Supreme Court defines 'property' as a 'legitimate claim of entitlement' to some benefit." Hyde Park, 226 F.3d at 1210 (quoting Board of Regents v. Roth, 408 U.S. 564, 477 (1972)). See also Federal Lands Legal Consortium v. United States, 195 F.3d 1190, 1197 (10th Cir. 1999) ("If a benefit is a 'matter of statutory entitlement for persons qualified to receive them,' then the government has created a property interest in that benefit.") (quoting Goldberg v. Kelly, 397 U.S. 254, 262 (1970)).

The Plaintiffs' "certain permissions" language, which is not supported by any useful analysis, is vague and broad. "An abstract need for, or unilateral expectation of, a benefit does not constitute 'property.'" Hyde Park, 226 F.3d at 1210. Instead, there must be a legitimate claim of entitlement to the property interest. Federal Lands Legal Consortium, 195 F.3d at 1196. The Plaintiffs have neither identified the "certain permissions" with any particularity nor demonstrated that the "certain permissions" are a matter of statutory entitlement. They do not engage in the "entitlement analysis" set forth in Hyde Park Company:

> "The entitlement analysis centers on the degree of discretion given the decisionmaker and not on the probability of the decision's favorable outcome. Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1116 (10th Cir. 1991). To prevail, [the plaintiff] must therefore demonstrate that a set of conditions exist under state and local law, "the fulfillment of which would give rise to a legitimate expectation" that the City Council would approve [plaintiff's] plat. Id. In other words, [the plaintiff] must show that under the applicable law, the City Council had limited discretion to disapprove the proposed plat. "Otherwise, the city's decisionmaking lacks sufficient substantive limitations to invoke due process guarantees." Id.

Hyde Park, 226 F.3d at 1210.

In Hyde Park, the plaintiff contended that it had "a protectible property interest in the

43

approval of its proposed plat because the City Council had a non-discretionary, mandatory duty

to approve the plat." Id. at 1212.  Hyde Park argued that the plat complied with all applicable

ordinances and so the City Council's obligation to approve the plat was ministerial.  The court

disagreed:

> While we are not altogether unsympathetic to Hyde Park's quandary, we conclude
> that the applicable ordinances read as a whole fail to place any discernible
> substantive limitations on the City's Council's discretion in this matter, and thus
> fail as a matter of federal constitutional law to establish more than Hyde Park's
> unilateral expectation that the City Council would approve its proposed plat.

Id.

The Plaintiffs have the burden of establishing a protectible property interest.  Id. at 1210.

Given the vagueness of their description of the claimed property interest, and their failure to

engage in the Hyde Park entitlement analysis, they have failed to satisfy their summary judgment

burden.  For that reason alone, they cannot survive the Defendants' motion for summary

judgment on their substantive due process claim.

In addition, the Plaintiffs certainly do not have a property interest in the manner in which

the inspection and permitting process occurs.  See, e.g., Torromeo v. Town of Fremont, 438 F.3d

113, 118 (1st Cir. 2006) (holding that town's unjustified delay in issuing building permits did not

implicate substantive due process rights of developer); Crown Point I, LLC v. Intermountain

Rural Elec. Ass'n, 215 F. Supp. 2d 1130, 1131 (D. Colo. 2002) (holding that developer did not

have protectible federal property interest in the hearing requirements for town's application

procedure for construction of electrical transmission lines on developer's property);  Gillies v.

Utah County, 765 F. Supp. 692 (D. Utah 1991) (holding that homeowner did not have protected

property interest in competently conducted building inspections).  See also Squaw Valley Dev.

44

Co. v. Goldberg, 375 F.3d 936, 948-49 (9th Cir. 2004) ("'There is no general liberty interest in being free from capricious government action.'") (quoting Nunez v. City of Los Angeles, 147 F.3d 867, 873 (9th Cir. 1998)).

And to the extent the Plaintiffs have characterized their property interest as building permits and certificates of occupancy, there is no evidence that they have actually been deprived of such permits and certificates of occupancy. The construction process is ongoing, and many homes have been completed and fully permitted. Although Plaintiffs are unhappy with the delay and are resentful of the extra steps required of them, it appears that they have been receiving permits and certificates of occupancy (just not at the rate they believe is proper).

Finally, the substantive due process component of the due process clause protects only "fundamental rights," which are "rights created by the Constitution." Greenbriar Village, L.L.C. v. Mountain Brook City, 345 F.3d 1258, 1262 (11th Cir. 2003). Property rights are not created by the Constitution; rather, they are created by independent sources such as state law. Id. Accordingly, "to the extent that [Highland] predicates its substantive due process claim directly on the denial of its state-granted-and-defined property right in the permit, no substantive due process claim is viable." Id. See also Graves v. Thomas, 450 F.3d 1215, 1220 (10th Cir. 2006) ("'Substantive due process claims are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution.'") (quoting Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998).) All the laws that have allowed Highland to obtain the various permissions necessary to develop the Utah Mini Ranches originate with the state and County, not the United States Constitution or some other source of federal law. In short, the Plaintiffs' situation does not implicate the substantive due process clause in the

45

Constitution.

The Eleventh Circuit decision in <u>Greenbriar Village, L.L.C. v. Mountain Brook City</u>, 345

F.3d 1258 (11th Cir. 2003), is informative:

> [Plaintiff] Greenbriar contends that the City's action with respect to its Permit was unconstitutionally irrational and arbitrary, and that the substantive component of the Due Process Clause protects generally against arbitrary and irrational action by the government. [The Eleventh Circuit] specifically discussed the dangers of broadening the scope of substantive due process in this fashion in <u>McKinney</u> [v. Pate, 20 F.3d 1550 (11th Cir. 1994) (en banc)]. . . .   According to McKinney, non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrary and irrationally.

345 F.3d at 1263.  The Eight Circuit in <u>Chesterfield Dev. Corp. v. City of Chesterfield</u>, 963 F.2d

1102 (8th Cir. 1992), articulated a similar sentiment when it denied the plaintiff's substantive

due process claim:

> Our decision would be the same even if the City had knowingly enforced the invalid zoning ordinance in bad faith and had no claim that St. Louis County zoning applied to the property.  A bad-faith violation of state law remains only a violation of state law.  Consequently, we reject the Corporation's assertion that the City's enforcement of an invalid zoning ordinance is the kind of "truly irrational" governmental action which gives rise to a substantive-due-process claim.  This does not mean that the conduct alleged is not actionable under state law, still less that we approve of it.  It means only that no right created by the Due Process Clause of the Fourteenth Amendment has been violated.

<u>Id.</u> at 1105.

Finally, the First Circuit put it well in <u>Creative Environments, Inc. v. Estabrook</u>, 680 F.2d

822 (1st Cir. 1982):

> Such a claim is too typical of the run of the mill dispute between a developer and a town planning agency, regardless of [plaintiff's] characterizations of it and of defendants' alleged mental states, to rise to the level of a due process violation. [Many cases] suggest that the conventional planning dispute–at least when not tainted with fundamental procedural irregularity, racial animus, or the like–which

46

takes place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution.  This would be true even were planning officials to clearly violate, much less "distort" the state scheme under which they operate.  A federal court, after all, "should not . . . sit as a zoning board of appeals." . . . . *Every* appeal by a disappointed developer from an adverse ruling by a local . . . planning board necessarily involves some claim that the board exceeded, abused or "distorted" its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason.  It is not enough simply to give these state law claims constitutional labels such as "due process" or "equal protection" in order to raise a substantial federal question under section 1983.

Create Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982), quoted in

Chesterfield, 963 F.2d at 1104.

For many of the same reasons articulated in the decisions cited above, the court finds that

the Plaintiffs have not presented any facts that would give rise to a protectible property interest.

       b.     Ripeness

Even if the Plaintiffs have established a protectible property interest, their substantive due

process claim is not ripe (but not for the reasons articulated by the Defendants).

Defendants contend that, "[i]nsofar as Highland's claims are not based on the flooring or

siding issues, they are unripe."  (Defs.' Mem. Supp. at 11.)  The Defendants focus on lack of a

final decision from the county commission regarding issues such as "the county's requirement

that [Highland] now provide mill certificates for its lumber . . . ."  (Id. at 14.)  Plaintiffs, in

response, characterize the Defendants' ripeness argument as one contending that they have not

exhausted all local remedies.  Plaintiffs say that they are not required to exhaust their

administrative remedies when they are faced with a biased tribunal.  (See Pls.' Opp'n Mem. at

17.)  Both sides miss the point of the ripeness issue.[36]

The ripeness analysis in the cases cited by Defendants focuses on the inextricable intertwining of claims of government taking of property without just compensation and claims of violation of substantive due process rights arising out of property interests.  According to the United States Supreme Court:

> Because we have "always been reluctant to expand the concept of substantive due process," we [have] held . . . that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior [such as the Takings Clause], that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."

County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (internal citations omitted).  In essence, substantive due process claims relating to property interests are generally subsumed into the Takings Clause.

In their ripeness analyses of takings and substantive due process claims, the courts look beyond the finality of land use decisions.  The United States Supreme Court has noted the courts' need to determine whether a reasonable variance was applied for and received, and, if not, whether just compensation was applied for and refused.  See, e.g., Williamson County, 473 U.S. at 186 (requiring plaintiff with unripe takings and due process claims to obtain final zoning

---

[36]The exhaustion issue is not relevant here.  In Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985), the United States Supreme Court rejected the property owner's argument that it need not seek a variance because its suit was based on § 1983, which does not require exhaustion of administrative remedies.  Id. at 192.  The Court stated that, in a ripeness context, "[t]he question whether administrative remedies must be exhausted is conceptually distinct . . . from the question whether an administrative action must be final before it is judicially reviewable."  Id.; accord Bateman v. City of W. Bountiful, 89 F.3d 704, 707 (10th Cir. 1996) (citing Williamson County for same proposition).

decision on appeal and, if necessary, utilize state procedures for obtaining just compensation).

Here the claims are not ripe because, to the extent that Plaintiffs contend that the County's actions interfered with the Plaintiffs' right to use their property as they see fit (within the bounds of reasonable regulation, of course),[37] their claim is subsumed by the Fifth Amendment takings clause and they may not bring an independent substantive due process claim. See, e.g., id. (dismissing the plaintiff's taking claim, the Court stated: "Because respondent has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures [the state] provides for obtaining just compensation, respondent's claim is not ripe.");  Signature Prop. Int'l Ltd. P'ship v. City of Edmond, 310 F.3d 1258 (10th Cir. 2002) (applying Williamson County ripeness test to hold that substantive due process claim brought to protect property interest in land use dispute was subsumed into Fifth Amendment just compensation clause and was not ripe because no final decision had been made regarding whether regulatory variation would be applied or just compensation refused);  Bateman v. City of W. Bountiful, 89 F.3d 704, 709 (10th Cir. 1996) (applying Williamson County and holding that property owner's substantive due process and equal protection claims were subsumed within the more particularized protections of the Takings Clause, and because takings claim was not ripe, neither were the ancillary constitutional claims); Landmark Land Co. v. Buchanan, 874 F.2d 717, 722 (10th Cir. 1989)[38] ("Before a federal court may step in and ascertain whether a local planning authority has taken property arbitrarily,

[37]"A temporary denial of property [can] be a taking."  Williamson County, 473 U.S. at 184.

[38]Abrogated on other grounds, Federal Lands Legal Consortium v. United States, 195 F.3d 1190 (10th Cir. 1999).

however, it must allow the local authority a chance to take final action.  Until it has a final action

before it, a court is unable to evaluate whether property was taken and whether the local

authorities' position was arbitrary.  Thus the Williamson County ripeness test applies with equal

force to substantive due process claims."); Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936,

949 (9th Cir. 2004) (holding that "substantive due process claims based on governmental

interference with property rights are foreclosed by the Fifth Amendment's Takings Clause. . . . In

Armendariz [v. Penman, 75 F.3d 1311 (9th Cir. 1996) (en banc)], we recognized that "the use of

substantive due process to extend constitutional protection to economic and property rights has

been largely discredited." . . . .  Since deciding Armendariz, we have consistently precluded

substantive due process claims based on a deprivation of property addressed by the Takings

Clause." (citation omitted; emphasis added).

        The Williamson County ripeness test applies here even though the Plaintiffs have not

alleged a takings claim, because they essentially allege that delay and allegedly unreasonable

documentation and building requirements interfered with the use of their property (and this

sounds much like a temporary takings claim).  See, e.g., Bateman v. City of W. Bountiful, 89

F.3d 704, 709 (10th Cir. 1996) ("The Tenth Circuit repeatedly has held that the ripeness

requirement of Williamson applies to due process and equal protection claims that rest upon the

same facts as a concomitant takings claim. . . . A contrary holding would render the Supreme

Court's decision in Williamson nugatory, as it would enable a resourceful litigant to circumvent

the ripeness requirements simply by alleging a more generalized due process or equal protection

violation.");  Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 949 (9th Cir. 2004) (holding

that "blanket prohibition [in Williamson County] applies even to a disguised takings claim.");

Rocky Mountain Materials & Asphalt, Inc. v. Board of County Comm'rs of El Paso County, 972 F.2d 309, 310-11 (10th Cir. 1992) (holding that because alleged deprivation under procedural due process claim (plaintiff's protectible property interest was right to mine property) was same deprivation alleged under unripe takings claim, due process claim was not ripe). See also Miller v. Campbell County, 945 F.2d 348, 352 (10th Cir. 1991) ("[W]e are reluctant in the context of a factual situation that falls squarely within that clause to impose new and potentially inconsistent obligations upon the parties under the substantive or procedural components of the Due Process Clause. It is more appropriate in this case to subsume the more generalized Fourteenth Amendment due process protections within the more particularized protections of the Just Compensation Clause.").

Also, the Plaintiffs claim that decisions made by the County have caused the value of their property to decrease. (See, e.g., Pls.' Mem. Opp'n at lxvi-lxvii.) Even if they have not alleged a takings claim, their claims of injury certainly implicate the takings clause. And they have not gone through the procedures necessary to properly position their claims for court review. For these reasons, the court finds that the Plaintiffs' claims are not ripe.

c.      Shocks the Conscience Standard

Alternatively, even if the Plaintiffs have established a protectible property interest, and even if their claims are ripe, they cannot meet the very high standard imposed on them. "The 'ultimate' standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges." Graves v. Thomas, 450 F.3d 1215, 1220 (10th Cir. 2006) (internal citations omitted). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or reckless

51

caused injury to the plaintiff by abusing or misusing government power.  That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995) (citing Collins v. City of Harker Heights Tex., 503 U.S. 115, 128 (1992)).

The Tenth Circuit has articulated three factors that district courts should look at to determine whether the conduct at issue shocks the conscience.  They are "(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety."  Ruiz v. McDonnell, 299 F.3d 1173, 1184 (10th Cir. 2002).

Courts should also keep in mind that ordinary negligence does not shock the conscience. Id.  "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).  Rather, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  Id. at 846.  To raise substantive due process concerns, the action must be motivated by a purpose to cause harm and be unrelated to a legitimate government objective.  Id. at 836.

Nothing in the record raises to the level of egregious conduct necessary to send Plaintiffs' substantive due process claim to a jury.  The Plaintiffs have failed to establish their elaborately conceived conspiracy theory originating with Mr. Dean's alleged "shakedown."  Certainly the parties do not get along.  And it is pretty clear that they do not like, respect, or even trust each other.  But what the court sees in the evidence does not shock its conscience.  Accordingly, the Defendants are entitled to summary judgment on the substantive due process claim.

**2.      Procedural Due Process**

The Plaintiffs also contend that their procedural due process rights were violated because they were subjected to a biased tribunal.  Although it is not clear from the briefing, it appears that the Plaintiffs are referring to the County Commission as well as the County Board of Appeals.  Apparently they contend that Mr. Mott's involvement on the Board of Appeals is sufficient to make that entity a biased decisionmaker.  They also apparently contend that individual county commissioners hold animosity toward the Plaintiffs and so that makes the County Commission a biased tribunal.

Certainly an unbiased decisionmaker is an essential element of procedural due process.  Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986).  But "honesty and integrity are presumed on the part of a tribunal . . . ."  Id.  And conclusory allegations of bias do not establish bias.  Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 520 (10th Cir. 1998).  Indeed, "a substantial showing of personal bias is required" to establish that a hearing was unfair.  Corstvet v. Boger, 757 F.2d 223, 229 (10th Cir. 1985).

The Plaintiffs have not met their substantial burden.  Many of their allegations are conclusory.  The fact that Mr. Mott is a non-voting ex officio member of the Board of Appeals is not in itself enough to establish bias.  The admissible evidence regarding Mr. Mott's dislike and distrust of the Plaintiffs is also not sufficient to establish bias on the part of the Board of Appeals, particularly because he was not a voting member.  As for the individual county commissioners, the admissible evidence regarding their views is thin.  The Plaintiffs have not raised genuine issues of material fact regarding the personal bias of those participating in the decisionmaking process.  Accordingly, the Defendants are entitled to summary judgment on the procedural due

process claim.

**D.      Qualified Immunity Defense**

Because the court finds that no constitutional violation occurred, it need not reach the

issue of qualified immunity.  Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).

**ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.      Defendants' Motion to Strike in Part the Declaration of Frank Joe Steed (Dkt #

202) is GRANTED.

2.      Defendants' Motion to Strike Declaration of Casey Dean in Part (Dkt # 206) is

GRANTED IN PART AND DENIED IN PART.

3.      Defendants' Motion to Strike Declaration of Cheryl Raines in Part (Dkt # 204) is

GRANTED IN PART AND DENIED IN PART.

4.      Defendants' Motion to Strike Declaration of Joan Ann Steed (Dkt # 208) is

GRANTED IN PART AND DENIED IN PART.

5.      Defendants' Motion to Strike Declaration of L. Vince Isbell (Dkt # 211) is

GRANTED IN PART AND DENIED IN PART.

6.      Defendants' Motion for Summary Judgment on Federal Claims (Dkt # 124) is

GRANTED.

7.      Defendants' request for costs in their motion for summary judgment is

GRANTED.

8.      The court declines to exercise supplemental jurisdiction over Plaintiffs' remaining

state law claims, which are hereby DISMISSED WITHOUT PREJUDICE.

9.      With no remaining claims before it, the court directs the clerk of the court to close this case.

DATED this 2nd day of March, 2007.

BY THE COURT:

TENA CAMPBELL
Chief Judge